UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BOBBY MCNEIL,

                   Plaintiff,

    v.                                Case No. 24-cv-756-pp

SHAWN TOMS
and MICHAEL WEILAND

                   Defendants.

---

**ORDER GRANTING IN PART DEFENDANTS' UNOPPOSED MOTION TO DISMISS CASE (DKT. NO. 18), DISMISSING DEFENDANT WEILAND AND LIMITING PLAINTIFF'S CLAIM AGAINST DEFENDANT TOMS**

---

Plaintiff Bobby McNeil is proceeding on a Fourth Amendment claim of excessive force against two Milwaukee Police Officers in this lawsuit under 42 U.S.C. §1983. The defendants have moved to dismiss the case for failure to state a claim, relying on video evidence of the events in question. The court will grant the motion in part, deny the motion in part and dismiss one defendant.

## I.    Background

The court received the plaintiff's complaint on June 18, 2024. Dkt. No. 1. On August 22, 2024, the court screened the complaint and allowed the plaintiff to proceed on a Fourth Amendment claim of excessive force against Milwaukee Police Officers Shawn Toms and Micheal Weiland. Dkt. No. 8.

On October 25, 2024, in lieu of filing an answer to the complaint, the defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and a declaration in support. Dkt. Nos. 18, 19; see Fed. R. Civ. P. 12(b)

(explaining that a motion to dismiss under Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed"). The defendants attached a certificate of service to their motion that shows that they mailed the motion and declaration in support to the plaintiff at the Milwaukee County Jail. Dkt. No. 18-1. The defendants also filed a video exhibit, which the court received on a flash drive. Dkt. No. 20. Defense counsel filed a letter explaining that she had mailed a disk containing the video evidence to the plaintiff at the jail. Dkt. No. 21.

The plaintiff had twenty-one days from the date of service of the motion to respond to it. <u>See</u> Civil Local Rule 7(b) (E.D. Wis.). The plaintiff's deadline for responding has passed, and the court has not received from him any response or opposition to the motion to dismiss. Nor has he notified the court about any issues viewing the video evidence. The court has not heard from the plaintiff since June 27, 2024, when it received his magistrate judge consent form. Dkt. No. 7.

On December 2, 2024, the plaintiff filed a letter in another federal case he has pending, requesting a status update. <u>United States v. McNeil</u>, Case No. 22-cr-224-LA, Dkt. No. 107. The envelope attached to that letter shows that, as of December 2, 2024, he remained incarcerated at the jail. <u>Id.</u>, Dkt. No. 107-1. On December 17, 2024 the plaintiff notified the court that he had been transferred from the Milwaukee County Jail to Dodge Correctional Institution; on March 14, 2025, he updated his location to Fox Lake Correctional Institution. Dkt. Nos. 23, 24.

2

Although he is no longer at the Milwaukee County Jail, the court has no reason to believe that the plaintiff did not receive the defendants' motion to dismiss and the disk containing the video exhibit, which were mailed to him at the jail approximately six weeks before his transfer to the Wisconsin prison system. The court could grant the motion and dismiss this case because the plaintiff has not responded to the motion or informed the court why he cannot do so. See Civil Local Rule 7(d) (E.D. Wis.). The court instead will treat the defendants' motion as unopposed and consider the merits of the motion, including the video evidence of the alleged events.

## II.  Motion to Dismiss (Dkt. No. 18)

### A.  Complaint and Screening Order

The court summarized the plaintiff's allegations in the screening order:

> The plaintiff alleges that on an unspecified day, the officers "jump[ed] out on [the plaintiff] with their 'guns' in th[eir] hands, pointed at [him]." [Dkt. No. 1] at 3. The plaintiff says that he was unarmed and "scared for [his] life," so he started to run "because police is [*sic*] known to just shoot and kill people." Id. The plaintiff says that he ran to the porch of a nearby house for his safety. Id. When he looked back, "Officer Weiland had his weapon [pointed] at [the plaintiff]," so the plaintiff jumped over the side of the porch and tried to go inside. Id. The plaintiff says the door was locked, and he could not "get in to protect [him]self." Id.

> The plaintiff alleges that Weiland then "fired his weapon," striking the plaintiff in his arm and around his mouth. Id. He says the weapon was a taser, and he felt its effects after he "landed on the ground and started to go up the driveway area of this house." Id. at 3–4. The plaintiff says the taser slowed his walking, and Officer Toms ran past him "and got in front of" him. Id. at 4. He says Toms "place[d] his taser against [the plaintiff's] mouth and stung [him]." Id. Toms allegedly again tased the plaintiff in the back when he "drift[ed] off to the right." Id. The plaintiff says that the officers' body cameras recorded the events. Id.

Dkt. No. 8 at 3–4.

The court analyzed the plaintiff's allegations under the Fourth Amendment. Id. at 5. The court opined that "[t]he fact that the plaintiff ran may have justified the officers giving chase or using some degree of force." Id. at 6 (citing Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 724–733 (7th Cir. 2013)). But the court also said that "it may have been unnecessary for the officers to use the tasers in the way that the plaintiff alleges. For example, if the first taser slowed down the plaintiff's running as he alleges, then it may not have been necessary to use a second taser at point blank range on the plaintiff's face or back." Id. (citing Abbott, 705 F.3d at 729–31). The court accepted the allegations in the complaint as true for purposes of screening and allowed the plaintiff to proceed on a Fourth Amendment "claim of excessive force against the officers for the way that they used their tasers while subduing him as alleged in the complaint." Id.

B.    Defendants' Position

The defendants assert that video evidence of the plaintiff's arrest shows a different series of events. Dkt. No. 18. They assert that, as shown in the video, the plaintiff was running from the officers before they gave chase. Id. at 4. They contend that Officer Weiland left his police car, began to chase the plaintiff and yelled at him to stop running, "Get on the ground" and "Get down." Id. The defendants say that the video shows that the plaintiff ignored those commands and continued running through a hole in a fence, across a parking lot and up to a residence that he attempted to enter. Id. Only after the plaintiff attempted

to enter the home did Weiland use his taser, but he did so "while standing several feet away from Plaintiff." <u>Id.</u> at 4–5. Weiland repeatedly called the plaintiff by his first name because the plaintiff "was known to Defendants." <u>Id.</u> at 5.

The defendants do not dispute that the officers seized the plaintiff. <u>Id.</u> But they contend that the video evidence shows that their use of their tasers to subdue him "was objectively reasonable given the circumstances surrounding the seizure." <u>Id.</u> These circumstances included "the on-scene perspective of the officers" and their need "to make quick decisions in the midst of a rapidly evolving situation;" that the plaintiff "began to flee from Defendants upon seeing their squad vehicle;" that the plaintiff "refused to comply with reasonable, lawful orders and attempted to enter a residence;" and that he continued to run from the officers after Weiland used his taser, dropping to the ground only after Toms also deployed his taser. <u>Id.</u> at 5–6. The defendants assert that the officers' "use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." <u>Id.</u> at 5 (citing cases). They conclude that their use of force was not excessive, and the court should dismiss the plaintiff's claims. <u>Id.</u> at 6. The defendants alternatively assert that they are entitled to qualified immunity. <u>Id.</u> at 6–9.

C.    <u>Video Evidence</u>

The defendants maintain that the court may consider the video evidence in deciding their motion to dismiss because the plaintiff references the video in his complaint, and the video is "central to Plaintiff's claims." <u>Id.</u> at 2 (citing

*Bogie v. Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013)). The Seventh Circuit has explained that "district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim' . . . includ[ing] exhibits attached to the complaint . . . or documents referenced in the pleading if they are central to the claim." *Id.* at 609 (quoting *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir. 1992) (internal quotation omitted). If a document "incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Id.* (citing *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007)). The Seventh Circuit specified that "these principles" equally apply to "video recordings attached to or referenced in a complaint." *Id.* (citing *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690–91 (7th Cir. 2012)).

The court agrees that it may consider the video evidence when deciding the motion to dismiss, because the plaintiff expressly referenced the video in his complaint, the video shows the exact events alleged in the complaint and the video is central to the plaintiff's claim that the officers used excessive force during his arrest. Dkt. No. 1 at 4 ("This all happen on 15th North ave. everything on camera footage, both officers was [*sic*] wearing Body cameras."); *see* *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024) (affirming district court's reliance on video evidence in deciding motion to dismiss where plaintiff "did not attach video from the body-worn cameras, but he relied on it for the allegations in his complaint"). The court will consider the video evidence, but will view it "in the light most favorable to the plaintiff," accepting "the plaintiff's well-pleaded

facts as true, while also not giving credence to facts that are clearly, definitively, and uncontrovertibly contradicted by video footage." Esco, 107 F.4th at 679 (citing Scott v. Harris, 550 U.S. 372, 380 (2007); and Bogie, 705 F.3d at 609).

The video is taken from Officer Weiland's body camera and shows Weiland's actions before and during the plaintiff's arrest, beginning at 11:37 a.m. on September 21, 2021. Dkt. No. 20 (Ex. A). The video begins with Weiland in the passenger seat of a squad car, his arm outstretched with his hand on the inner handle of the passenger door. Id. at 0:01–0:15. There is no audio for this portion of the video. At 0:16, Weiland pulls on the handle, pushes open the passenger door and immediately takes off running. He holds a gun in his right hand as he runs up the driveway of a house and into the backyard. Id. at 0:16–0:29. A Black man wearing a grey sweatshirt can be seen running several feet ahead of Weiland. Id. at 0:27.

At 0:28, the audio for the video kicks in as Weiland yells, "Police! Get on the ground! . . . Get down!" Weiland chases the man through a hole in the bottom of a fence behind the house as he informs other officers on his radio, "He's through the [unintelligible]." Id. at 0:28–37. Behind the fence is a concrete parking lot, and Weiland announces, "AutoZone, AutoZone" on his radio. Id. at 0:37–38. Weiland begins running again, the man not far in front of him also running. Id. at 0:38–0:39. Weiland announces into his radio, "East bound, grey hoodie, blue jeans" before yelling out to the man, "Get on the ground, Bobby! Get on the ground!" Id. at 0:40–0:46.

7

Weiland chases the man, now identified as the plaintiff, around the corner of the parking lot store and down a residential street. Id. at 0:46–0:53. He again yells at the plaintiff to get on the ground, as the plaintiff runs up to a green house bearing the number 2237. Id. The plaintiff backs up to a railing on the porch of the house, turns and jumps over the railing as Weiland repeats, "Get on the ground, now," and fires his taser at the plaintiff. Id. at 0:54–0:56. Weiland is several feet away from the plaintiff when he fires his taser, and the plaintiff has his back to Weiland as he jumps over the railing on the porch. Id. The plaintiff lands on his feet and turns and runs along the green house and into the backyard. Id. at 0:56–0:58. It is not clear whether Weiland's taser hit the plaintiff, but the plaintiff does not appear to slow down. Id. Weiland retreats down the porch but trips and falls onto the ground as he attempts to pursue the plaintiff, exclaiming and saying, "Get him, get him." Id. at 0:58–1:02. As Weiland gets to his feet, another officer can be seen running along the green house into the backyard where the plaintiff ran. Id. Weiland says, "He might be cutting," and other voices can be heard yelling in the background. Id. at 1:02–1:07.

Weiland begins to walk into the backyard, breathing heavily. Id. at 1:07–1:09. The plaintiff is by a garage, still running from the officers. Id. Weiland yells, "Bobby, get on the ground!" Id. at 1:08–1:10. The plaintiff appears to trip and fall face first into a small space between the fence of the green house and the garage. Id. at 1:09–1:10. Another officer is standing about ten feet away with his arm pointing at the plaintiff, his taser in his hand. Id. The other officer

8

slowly approaches where the plaintiff fell and says, "Don't fucking move." Id. at 1:09–1:14. Weiland catches up to the plaintiff and the other officer, who kneels with his taser pointed at the plaintiff lying on his side on the ground. Id. at 1:14. The other officer puts his left hand, which is not holding the taser, on the plaintiff's left arm and rolls him over face-first onto the ground. Id. at 1:14–1:15. He does not again use his taser, which is in his right hand. Id.

Weiland approaches the other officer and puts his left hand on the officer's back. Id. The officer is holding the plaintiff's left wrist with his unarmed left hand. Id. Weiland tells the officer, "I got him, I got him. Keep your taser . . . ." Id. at 1:15–1:18. The other officer repeats, "Don't move." Id. The wires from the other officer's taser are deployed out from the unit, and the prongs of the taser can be seen on the plaintiff's back, stuck in his grey hoodie. Id. Weiland steps over the taser wires to the plaintiff's head, telling either the officer or the plaintiff, "Sorry, bud." Id. at 1:18–1:22. Weiland lifts the plaintiff's head and pulls the plaintiff's right arm from underneath his head and back behind his body to be handcuffed. Id. at 1:22–1:30. He holds handcuffs in his left hand as he says to the plaintiff, "Pull your hand to the back now." Id. Another taser prong is stuck in the plaintiff's sweatshirt on his right arm. Id. A third officer appears, kneels and places his knees on the plaintiff's lower back and right armpit and helps Weiland pull the plaintiff's right arm behind his back. Id. at 1:26–1:34. The two officers besides Weiland tell the plaintiff, "Give me your arm, don't resist, don't resist," "You will get tased again" and "Put your

hands around your back. Now." Id. The plaintiff opens and closes his eyes but does not say anything as the officers handcuff him. Id. at 1:34–1:45.

Once the plaintiff is handcuffed, Weiland slowly says to him, "Bobby, are you OK"? Id. at 1:46–1:48. The plaintiff does not respond and is breathing heavily. Id. at 1:48–1:50. Another officer asks the plaintiff if he needs medical and tells him that the officers are going to roll him over. Id. at 1:48–1:52. The plaintiff still does not respond, and Weiland again asks if he is ok. Id. at 1:52–1:58. He moves a twig away from the plaintiff's face, and the plaintiff has his eyes open but not blinking and is breathing heavily. Id. Weiland says, "I know you just got tased. If you're hurting, tell me. Come on, man. The fight's over Just talk to us." Id. at 1:58–2:10. Weiland notes that the plaintiff is bleeding from the side of his face where he hit the ground. Id. at 2:11–2:12. The officers pull the taser prongs from the plaintiff's sweatshirt and repeat that they are going to roll him over. Id. at 2:12–2:29. Weiland asks the plaintiff if he has any weapons on him, but the plaintiff does not respond. Id. at 2:29–2:35.

The officers roll the plaintiff onto his right side and lift him away from the garage and into a seated position. Id. at 2:35–3:07. The plaintiff has a small amount of blood on the side of his face and a yellow or white substance near his mouth. Id. He is blinking and breathing heavily but does not say anything. Id. Weiland recounts the chase to other officers as one of them holds the plaintiff upright and tells him, "Deep breath, buddy." Id. at 3:07–3:16. Weiland refers to this officer as "Shawn," revealing that he is the other defendant and the officer who tased the plaintiff behind the green house before the plaintiff fell

to the ground. <u>Id.</u> at 3:22. The two officer–defendants remain with the plaintiff as the others leave to call for medical assistance. <u>Id.</u> at 3:22–3:36.

The remainder of the video shows the officers sitting and talking with the plaintiff and examining his face as they wait for other officers and medical assistance. <u>Id.</u> at 3:36–6:30. Weiland tells one officer that he saw "Bobby running back this way, Toms fucking tased him, dude . . . he just *dropped*." <u>Id.</u> at 6:48–6:54. Weiland eventually leaves the area to retrace "the flight path." <u>Id.</u> at 7:09–12:36. As Weiland wraps up the wires of his taser he asks aloud, "Where the fuck are my probes?" <u>Id.</u> at 7:28–7:46.

## III.   Analysis

### A.   <u>Legal Standard</u>

The defendants bring their motion under Federal Rule of Civil Procedure 12(b)(6), which allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." The court explained in the screening order that to state a claim, "a complaint must include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Dkt. No. 8 at 2 (quoting Fed. R. Civ. P. 8(a)(2)). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

When considering a motion to dismiss under Rule 12(b)(6), the court must base its decision only on the pleadings, which include "the complaint itself, documents attached to the complaint, documents that are critical to the

complaint and referred to in it, and information that is subject to proper judicial notice." Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012). If the moving party presents additional documents outside the pleadings, the court must either exclude them from consideration of the motion or convert the motion into one for summary judgment under Fed. R. Civ. P. 56. See Fed. R. Civ. P. 12(d); Geinosky, 675 F.3d at 745 n.1.

B.    Discussion

As the court explained in the screening order, it "analyzes the plaintiff's allegations under the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Dkt. No. 8 at 5 (quoting Graham v. Connor, 490 U.S. 386, 394 (1989); and citing Tennessee v. Garner, 471 U.S. 1, 7–8 (1985)). Under the Fourth Amendment, the court considers the objective reasonableness of the force used based on the events confronting the defendants at the time and not on their subjective beliefs or motivations. See Horton v. Pobjecky, 883 F.3d 941, 949–50 (7th Cir. 2018) (citing Graham, 490 U.S. at 396–97; County of Los Angeles v. Mendez, 581 U.S. 420, 426–27 (2017)). This test carefully balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Horton, 883 F.3d at 949 (quoting Graham, 490 U.S. at 396). The court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of

the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

In determining whether the officers violated the plaintiff's Fourth Amendment rights, the court "must consider 'the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances,' without resort to 'hindsight's distorting lens.'" Dkt. No. 8 at 5 (quoting Horton, 883 F.3d at 950; and citing Graham, 490 U.S. at 396, and Ford v. Childers, 855 F.2d 1271, 1276 (7th Cir. 1988)). "'The operative question . . . is whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" Horton, 883 F.3d at 949 (quoting Mendez, 581 U.S. at 427–28 (internal quotation omitted)).

1. *Officer Weiland*

The undisputed video evidence shows that Officer Weiland did not use excessive force on the plaintiff when pursuing or arresting him on September 21, 2021. The video shows that Weiland pursued the plaintiff for about one minute, beginning after he exited his squad car. The plaintiff immediately fled from Weiland, ignoring his repeated commands for the plaintiff to get on the ground or get down. Weiland did not use any force on the plaintiff until the plaintiff approached the green house. The plaintiff alleges in his complaint that he attempted to enter the house, but the door was locked. Weiland ordered the plaintiff, "Get on the ground now," but the plaintiff again ignored him and jumped over the porch railing. Weiland deployed his taser—Weiland's only use of

force—as the plaintiff turned his back to Weiland and jumped over the railing. The video does not show whether the taser prongs hit the plaintiff, but later in the video, taser prongs can be seen stuck to the plaintiff's sweatshirt. Weiland also notes after the chase that his taser probes are missing. The plaintiff alleged that the prongs hit him in the arm and mouth, which slowed him down. Nonetheless, the plaintiff continued running to the side and behind the green house. Weiland attempted to pursue him but tripped and fell to the ground. The plaintiff does not allege that Weiland used any additional force against him.

Neither the complaint nor the defendants' motion explains why the officers were chasing the plaintiff. But the video shows that the officers knew the plaintiff by name, and that he began running as soon as the officers spotted him. Because the plaintiff ran from Weiland, ignored Weiland's commands and actively evaded him, Weiland was justified in using his taser to try to subdue the plaintiff. See Graham, 490 U.S. at 396–97; Horton, 883 F.3d at 949; Abbott, 705 F.3d at 724. Weiland's single use of his taser was not excessive given the "intense, dangerous, uncertain, and rapidly changing circumstances" confronting him. Horton, 883 F.3d at 950. That one of the prongs from Weiland's taser may have hit the plaintiff in the mouth does not make his use of force excessive. The video shows that Weiland deployed his taser toward the plaintiff from at least five feet away. He does not aim at the plaintiff's face or mouth, and the plaintiff does not allege that Weiland *intentionally* hit him in the mouth. The taser hitting the plaintiff in the mouth was incidental, "an inexorable consequence of the situation." Forrest v. Prine, 620 F.3d 739, 746 (7th Cir.

2010) (rejecting plaintiff's request for inference that officer intentionally hit him in the face with taser because evidence showed plaintiff "was pacing in an agitated manner when [the officer] discharged the taser device").[1]

The court finds that the video evidence incontrovertibly contradicts the plaintiff's allegations of excessive force against Officer Weiland. The court will dismiss Weiland because the complaint, as contradicted by the video evidence, does not state a claim against him.

2. *Officer Toms*

But based on the video evidence, the court cannot find that Officer Toms did not use excessive force on the plaintiff during the September 21, 2021 arrest. Toms is not in the first minute of the video, during which Weiland chases the plaintiff through the neighborhood. Toms first appears on the video at about 0:56. But the plaintiff is not visible from 0:56 through 1:08, as Weiland trips and falls, and the plaintiff runs behind the green house. Toms runs after the plaintiff, and voices can be heard yelling in the background. The plaintiff says in his complaint that Toms ran past him, got in front of him, placed his taser against the plaintiff's mouth and "stung" him with it. Dkt. No. 1 at 4. This interaction is not visible on Weiland's bodycam video because Weiland is still at the front of the green house. The plaintiff says that he then ran "off to the right" from Toms, who again used his taser on the plaintiff, hitting him in the back. Id.

---

[1] After Toms subdues the plaintiff, and the plaintiff falls to the ground, Weiland pulls the plaintiff's arm behind his back, assists in lifting and moving him and holds him temporarily in a seated position. The complaint alleges nothing about these acts, and they would not support a claim of excessive force against Weiland.

The video shows the plaintiff running from Toms, who extends his arm and fires his taser at the plaintiff. Dkt. No. 20 at 1:08–1:10. The probes hit the plaintiff in the back and later can be seen stuck to his grey sweatshirt. This taser hit fells the plaintiff, who collapses to the ground (as Weiland later recounts to his colleague).

The court must accept as true the complaint's allegation that Toms used his taser by pressing it directly against the plaintiff's mouth because the video does not show Toms and the plaintiff during this alleged interaction. See Esco, 107 F.4th at 678–79 (citing Bogie, 705 F.3d at 609). Because Toms and the plaintiff are not in the video for this eight-second period, the video does not "incontrovertibly contradict[] the allegations in the complaint'" that Toms "stung" the plaintiff by using his taser against the plaintiff's mouth. Id. at 679 (quoting Bogie, 705 F.3d at 609). Although the video shows that Weiland and Toms pursued the plaintiff to the back of a house, it does not allow the conclusion that Toms was justified in using his taser against the plaintiff's mouth to subdue him, or whether Toms perhaps could have used the taser against the plaintiff's body or deployed it from a distance—as he later did—to stop the plaintiff. The video does not show whether the plaintiff was using aggression or force that would justify the point-blank use of the taser. Nor does the video show whether the plaintiff had a weapon or was threatening Toms. The court is left with the conclusion it reached in the screening order based on only the complaint's allegations: The plaintiff has alleged sufficient facts to state a

claim of excessive force against Toms for the way he used his taser while subduing the plaintiff. Dkt. No. 8 at 6.

The evidence later may show that Toms did not use his taser against the plaintiff's mouth or that he had an objectively reasonable justification for doing so. But based on the allegations in the complaint and the video evidence, the complaint states a valid Fourth Amendment claim against Toms for using his taser directly against the plaintiff's mouth when subduing him on September 21, 2021.

This conclusion is limited to the plaintiff's allegation that Toms "stung" him with the taser. The video evidence shows that Toms did not otherwise use excessive force against the plaintiff. Once Toms and the plaintiff are back in view of Weiland's body camera, the plaintiff can be seen again fleeing from Toms and running toward the side of the garage or the fence line. Toms deploys his taser from around ten feet away, striking the plaintiff in his back. The probes of the taser stick into the plaintiff's grey sweatshirt, and the plaintiff falls. Toms then attends to the plaintiff, rolls him onto his front and pulls his arms behind his back to handcuff him. He does not again use his taser or use more force than is necessary to apprehend the plaintiff and ensure he will not again attempt to flee. For the same reasons applicable to the plaintiff's claim against Weiland, the court finds that the plaintiff does not state a claim of excessive force against Toms for deploying his taser and hitting the plaintiff in the back given the circumstances confronting Toms. See Graham, 490 U.S. at

396–97; <u>Horton</u>, 883 F.3d at 949; <u>Abbott</u>, 705 F.3d at 724. The court will not allow the plaintiff to proceed on these allegations.

### 3. *Qualified Immunity*

The defendants alternatively contend that, if the court maintains "Plaintiff properly stated a claim and that Officer Garcia [*sic*] violated Plaintiff's Fourth Amendment rights," the court still should dismiss the plaintiff's claims under the doctrine of qualified immunity. Dkt. No. 18 at 6. Presumably, the defendants meant to refer to Weiland and Toms rather than Garcia, who is not a defendant.[2]

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Figgs v. Dawson</u>, 829 F.3d 895, 905 (7th Cir. 2016) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). Qualified immunity is an affirmative defense. To defeat Toms's assertion of qualified immunity, the plaintiff must show that 1) the defendant violated his constitutional right and 2) the right at issue was clearly established at the time of the violation. <u>Pearson</u>, 555 U.S. at 232. If the plaintiff fails to satisfy either inquiry, then Toms is entitled to qualified immunity. <u>See</u> <u>Muhammad v. Pearson</u>, 900 F.3d 898, 904 (7th Cir. 2018) (citing <u>Gibbs v. Lomas</u>, 755 F.3d 529, 537 (7th Cir. 2014)). For purposes of qualified immunity, the court views the evidence in the light most

---

[2] Because the court is dismissing the claim against Weiland on the merits, there is no need to address whether he would be entitled to qualified immunity.

favorable to the plaintiff because he is the nonmoving party. See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019).

The defendants assert that the video evidence demonstrates that "Officer Toms' challenged actions were consistent with relevant case law, and therefore within constitutional parameters. A reasonable police officer could have believed lawful the particular conduct at issue." Dkt. No. 18 at 8–9. The court may agree with the defendants as it relates to Toms's use of the taser from a distance, for the reasons explained above. But the defendants do not parse out Toms's actions, instead generalizing his conduct as a single act. The court has separated Toms's conduct into two distinct parts—the use of the taser against the plaintiff's mouth and the second use of the taser, from a distance, to the plaintiff's back. The court will consider whether Toms is entitled to qualified immunity only as it relates to the first of these parts because based on the video evidence, it is dismissing the plaintiff's claim as it relates to the second taser use.

The defendants assert that the clearly established law supporting dismissal of the claim against Toms "should not be defined 'at a high level of generality.'" Id. at 8 (quoting White v. Pauly, 580 U.S. 73, 79 (2017), and citing Ashcroft v. al–Kidd, 563 U.S. 731, 742 (2011)). Yet they fail to cite any case specifically discussing whether an officer is constitutionally permitted to use a taser against the mouth of a fleeing suspect. The court's review of cases in this circuit discussing this specific issue or a similar one has revealed no consensus; the few cases the court located show that whether the use of a taser on a

person's face (or at point-blank range) is deemed reasonable is unsurprisingly fact specific. See, *e.g.*, Forrest, 620 F.3d at 746 (finding officer's use of taser on "an intoxicated, defiant, angry and belligerent pretrial detainee" was reasonable, even though one prong of taser hit detainee in his face near his eye); Shirley v. Rabensteine, No. 22-2147, 2023 WL 129432, at *2 (7th Cir. Jan. 9, 2023) (affirming grant of summary judgment for officers who twice used a taser on fleeing felon suspected in recent shooting, one time hitting him in the face, because suspect "had actively resisted arrest for hours by car, by foot, and by hiding" and officers reasonably believed that he was still resisting arrest when they used force); but see Est. of Gonzalez by Henriquez v. City of Waukegan, Case No. 07 C 18, 2010 WL 11586538, at *12 (N.D. Ill. Mar. 3, 2010) (denying qualified immunity for officer who used taser multiple times at point-blank range against "an evidently disturbed but innocent individual").

These cases suggest that whether an officer is entitled to qualified immunity for using a taser on a suspect's face or mouth or at close range to subdue him is fact-specific and may turn on whether the officer intentionally or incidentally made contact to the suspect's face or mouth and whether the suspect was actively resisting or fleeing. Here, the facts underlying the plaintiff's claim are underdeveloped because this case has yet to proceed beyond the pleadings. The only information the court has is the complaint, which alleges that Officer Toms *intentionally* "stung" the plaintiff by using the taser against his mouth after Officer Weiland's taser slowed him to a walk. That version of facts likely would not entitle Toms to qualified immunity because a reasonable officer

in these circumstances would know that using a taser directly against a suspect's mouth, instead of from a distance or against his body, was not justified. This is particularly true if the plaintiff had slowed to a walk as he alleges, though the video shows him running from Weiland seconds earlier. The video evidence does not contradict the plaintiff's allegation that Toms used the taser on the plaintiff's mouth—it does not show these events at all. The defense has yet to provide its version of facts specific to this allegation.

Given the lack of developed facts on this issue, the court cannot determine whether Toms should have known that his conduct violated the plaintiff's rights. The court will deny qualified immunity to Toms on the plaintiff's claim that he unreasonably used his taser against the plaintiff's mouth. Toms may raise qualified immunity as a defense in later proceedings if the developed evidence supports that defense.

4.   *Summary*

The court finds that the video evidence contradicts the complaint's allegations that Officer Weiland used excessive force against the plaintiff on September 21, 2021. The court will dismiss Weiland as a defendant.

The court finds that the video evidence does not contradict the plaintiff's allegation that Officer Toms used excessive force against him when he "stung" the plaintiff by using his taser against the plaintiff's mouth. Nor does the video evidence support a finding that Toms is entitled to qualified immunity. The plaintiff may proceed on this claim. The plaintiff may not proceed on his allegation that Toms used excessive force when he used his taser on the

plaintiff a second time as the plaintiff attempted to run from him because the video evidence shows that use of force was not excessive. The court will limit the plaintiff's Fourth Amendment claim to his allegation that Toms "stung" him by using the taser against the plaintiff's mouth.

## IV. Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the defendants' unopposed motion to dismiss. Dkt. No. 18. The court **GRANTS** the motion as to Officer Weiland and **DISMISSES** Weiland from this case.

The court **DENIES** the motion for Officer Toms but **ORDERS** that the plaintiff's Fourth Amendment claim against Toms is limited to his allegation that Toms used his taser against the plaintiff's mouth and "stung" him. The plaintiff may not proceed on his allegations that Toms used excessive force against him at any other time.

The court **ORDERS** that Officer Toms must respond to the complaint within sixty days of this order.

Dated in Milwaukee, Wisconsin this 18th day of June, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**